# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| | | |
|---|---|---|
| CITY OF MONROE, OHIO | : | |
| 233 S. Main St. | : | |
| Monroe, Ohio 45050, | : | Civil Action No. _____ |
| | : | |
| Plaintiff, | : | Judge _____ |
| | : | |
| v. | : | |
| | : | |
| MIDDLETOWN COKE COMPANY, INC., | : | |
| Parkside Plaza | : | COMPLAINT |
| 11400 Parkside Drive | : | |
| Knoxville, TN 37934, | : | |
| | : | |
| and | : | |
| | : | |
| | : | |
| SUNCOKE ENERGY, INC. | : | |
| Parkside Plaza | : | |
| 11400 Parkside Drive | : | |
| Knoxville, TN 37934, | : | |
| | : | |
| Defendants. | : | |

Pursuant to Section 304(a)(3) of the Clean Air Act ("CAA" or "the Act"), 42 U.S.C. § 7604(a)(3), the City of Monroe, Ohio brings this action against Middletown Coke Company, Inc. ("Middletown Coke Company") and SunCoke Energy, Inc. ("SunCoke Energy"), seeking injunctive relief, civil penalties, attorney fees, and other relief to address the Defendants' proposal to construct, or actual construction of, a major stationary source of air pollution without a permit issued under the New Source Review ("NSR") program of the Act, including its Prevention of Significant Deterioration ("PSD") and Nonattainment New Source Review requirements. For its Complaint, Monroe alleges as follows:

## I. <u>NATURE OF THE ACTION</u>

1. This is a civil action brought against Middletown Coke Company and SunCoke Energy, Inc., pursuant to CAA Section 304(a)(3), 42 U.S.C. § 7604(a)(3), for injunctive relief, the assessment of civil penalties, recovery of attorney fees, and other appropriate relief for violations of the Act's PSD provisions, 42 U.S.C. §§ 7470-7492, and Nonattainment New Source Review provisions, 42 U.S.C. §§ 7501-7515. The Act's PSD and Nonattainment New Source Review provisions require a new or modified major source of air pollutants to obtain a preconstruction permit providing for the installation of state-of-the-art pollution control equipment.

2. CAA Section 304(a)(3), 42 U.S.C. § 7604(a)(3), provides that any person may commence a civil action against any person who proposes to construct or constructs any new or modified major emitting facility without a permit required under CAA Subchapter I, Part C (relating to PSD) or Subchapter I, Part D (relating to NSR).

3. Defendants have proposed to construct, or begun actual construction of, a coke production plant (the "Coke Plant") adjacent to the AK Steel Middletown Works, Middletown, Butler County, Ohio, without first obtaining the necessary NSR permit incorporating PSD and Nonattainment NSR requirements and authorizing the construction of the Coke Plant. Consequently, the Coke Plant will be constructed, or is being constructed, without installing the best available control technology and achieving the lowest achievable emissions rate, as applicable, to control emissions of sulfur dioxide, particulate matter, carbon monoxide, and nitrogen oxides, and without performing the air quality modeling, obtaining emissions offsets, and satisfying other applicable requirements of the Act, the Act's implementing regulations, and the Ohio State Implementation Plan ("SIP").

2

4. Defendants' Coke Plant will annually emit up to 479 tons of nitrogen oxides ("$NO_x$"), 1,584 tons of sulfur dioxide ("$SO_2$"), 129 tons of carbon monoxide ("CO"), and 439 tons of various forms of particulate matter ("PM"). The Coke Plant will also emit nitrogen dioxide and mercury. The release of these pollutants into the atmosphere will impair air quality locally and far downwind of the Coke Plant. Furthermore, Defendants' Coke Plant will annually emit up to an additional 114 tons of fine particulate ($PM_{2.5}$) in an air quality region that currently does not comply with the health standard, known as the National Ambient Air Quality Standard ("NAAQS"), for $PM_{2.5}$. An order of this Court enjoining Defendants from further construction of the Coke Plant until Defendants obtain a permit to install that complies with the PSD and Nonattainment NSR programs will protect the air breathed by the citizens of the City of Monroe downwind of the proposed Coke Plant, and will ensure that the Butler County region makes reasonable further progress toward attainment of the $PM_{2.5}$ NAAQS.

5. $SO_2$, $NO_x$, and PM, when emitted into the air, can each have adverse environmental and health impacts. $SO_2$ interacts in the atmosphere to form sulfate aerosols, which may be transported long distances through the air. Most sulfate aerosols are particles that can be inhaled. High levels of sulfate aerosols are associated with increased sickness and mortality from lung disorders, such as asthma and bronchitis. Lowering sulfate aerosol emissions may significantly reduce the incidence and the severity of asthma and bronchitis and associated hospital admissions and emergency room visits.

6. Nitrogen oxides have numerous adverse effects on health and welfare. $NO_x$ reacts with other pollutants and sunlight to form ground level ozone, which scientists have long recognized as being harmful to human health and the environment. Ozone can cause decreases in lung function (especially among children who are active outdoors) and respiratory problems

3

leading to increased hospital admissions and emergency room visits.  Ozone may inflame and possibly cause permanent damage to people's lungs.  In addition, ozone causes damage to vegetation.  Nitrogen dioxide ("$NO_2$"), one type of NOx, is a dangerous pollutant that can cause people to have difficulty breathing by constricting lower respiratory passages.  It may also weaken a person's immune system, causing increased susceptibility to pulmonary and other forms of infections.  While children and asthmatics are the primary sensitive populations, individuals suffering from bronchitis, emphysema, and other chronic pulmonary diseases have a heightened sensitivity to $NO_2$ exposure.

7.  Emissions of $SO_2$ and $NO_x$ form fine nitrate and sulfate particles.  Inhalation of these fine particles is associated with respiratory distress, cardiovascular disease, and premature mortality.

8.  Particulate matter is the term for solid or liquid particles found in the air.  Particulate matter with a diameter of 10 micrometers or less is referred to as "$PM_{10}$."  Particulate matter with a diameter of 2.5 micrometers or less is referred to as "$PM_{2.5}$."  Breathing air containing $PM_{10}$ or $PM_{2.5}$ at levels above the NAAQS increases the incidence of premature death, cancer, respiratory disease, and lung damage.  $PM_{2.5}$ poses even greater health risks than $PM_{10}$.  The elderly, children, and people with chronic lung disease, influenza, or asthma, tend to be especially sensitive to the effects of $PM_{2.5}$ and $PM_{10}$.

9.  Emissions of CO can cause harmful health effects by reducing oxygen delivery to the body's organs (including the heart and brain) and tissues.  The health threat from lower levels of CO is most serious for those who suffer from cardiovascular diseases such as clogged arteries, angina, or congestive heart failure.

10. Mercury increases the risk of nervous system damage and birth defects in families consuming fish accumulating mercury deposited into waterways from the air.

11. $NO_x$ and $SO_2$ interact in the atmosphere with water and oxygen to cause sulfuric and nitric acids, commonly known as acid rain. Acid rain and other acid deposition cause damage to trees and vegetation, exacerbate the corrosion of metals, degrade other building materials, and accelerate the decay of buildings and other outdoor structures.

12. Despite the health threats from the air pollutants that the Coke Plant will emit, the Defendants plan to install air pollution control equipment at the Coke Plant that is inferior to air pollution controls at other coke plants. The laxity of the Coke Plant's air pollution controls not only provides it with a competitive advantage over other coke plants, but makes it an environmental threat.

13. The adverse impact of the Coke Plant has been unnecessarily aggravated by siting it on agricultural land near the doorsteps of Monroe's facilities, residents, and businesses, when it could have been sited on a more distant brownfield site at an industrial complex owned by its sole customer, AK Steel. Monroe's neighborhoods are located less than 2000 feet from the facility. The prevailing wind direction will convey air contaminants from the Coke Plant into Monroe.

## II. JURISDICTION AND VENUE

14. This Court has jurisdiction of the subject matter of this action pursuant to Section 304(a)(3) of the Act, 42 U.S.C. § 7604(a)(3) (citizen suits), 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1337 (interstate commerce), 28 U.S.C. § 1355 (action for penalty), and 28 U.S.C. § 2201 (declaratory judgment).

15.  Venue is proper in this District pursuant to Section 304(c) of the Act, 42 U.S.C. § 7604(c), and 28 U.S.C. §§ 1391(b)-(c) and 1395(a), because the Defendants reside in this District, violations have occurred and will occur in this District, and the facility that is the subject of this Complaint is located in this District.

16.  No prior notice of this action is required under 42 U.S.C. § 7604(b), because actions brought pursuant to 42 U.S.C. § 7604(a)(3) require no notice.

### III. <u>PARTIES</u>

17.  Plaintiff, the City of Monroe, Ohio ("Monroe"), is an Ohio municipal corporation situated in Butler County, Ohio, immediately south of the proposed Coke Plant site.

18.  Monroe is a "person" within the meaning of § 302(e) of the Act, 42 U.S.C. § 7602(e), that may commence a civil action under 304(a)(3) of the Act, 42 U.S.C. 7604 (a)(3). Monroe will be adversely affected by emissions of $SO_2$, $NO_x$, CO, PM, $PM_{10}$, $PM_{2.5}$, and other pollutants emitted by the Coke Plant in violation of Parts C and D of Title I of the Act, because these pollutants cause injuries such as those described in Paragraphs 3 through 13 above.  For example, and without limitation, Monroe will experience the following injuries as a consequence of Defendants' violations of law:

(A) Monroe maintains and utilizes numerous municipal facilities to facilitate the exercise of its governmental functions and to enhance the well-being of the community.  For example, and not necessarily by limitation, Monroe maintains and utilizes an Administrative Building, municipal services facility, fire station, and community park located near the site for the Coke Plant.  These facilities, as well as metal signs, signposts, utility poles, traffic lights, and other municipal service structures owned

and maintained by Monroe, will be damaged and degraded as a result of acid deposition caused by Coke Plant emissions.

(B) Monroe's municipal employees work in areas that will be polluted by emissions from the Coke Plant, resulting in the potential for increased sickness, decreased productivity, and increased medical leave time for Monroe's municipal employees. Furthermore, as a result of increased medical claims resulting from Coke Plant emissions, Monroe will experience increases in the premiums it pays for health insurance for its municipal employees. Furthermore, continued violation of the NAAQS as a result of the Coke Plant emissions will impair Monroe's ability to recruit and retain municipal employees.

(C) Emissions from the Coke Plant and the continued violation of the NAAQS resulting from said emissions will impair Monroe's efforts to promote the economic development of its community by deterring and impairing the attraction and retention of businesses and employees in Monroe. The continued violation of the NAAQS resulting from said emissions will also impair Monroe's efforts to promote economic development by making it more difficult for new or existing businesses to locate or expand in Monroe, thus putting Monroe at an economic disadvantage to other metropolitan areas with better air quality. Defendants' evasion of NSR requirements also puts Monroe at an economic disadvantage to the City of Middletown by allowing Middletown to expand its economic base without complying with applicable air pollution laws and regulations.

(D) Emissions from the Coke Plant will degrade and impair the aesthetics of the City of Monroe, and will degrade and impair the public use and public benefit of Monroe's properties, including its municipal park.

(E) Emissions from the Coke Plant and the continued violation of NAAQS resulting from said emissions, will impair the attraction and retention of residents, businesses, visitors, and employees to and in Monroe, thus causing a loss of tax revenues to fund and support municipal services in Monroe.

(F) By choosing not to obtain a permit under the NSR program and thus evading NSR preconstruction review, Defendants have deprived Monroe of the opportunity to participate in the NSR review and public comment process designed to prevent the injuries described in the foregoing paragraphs. Instead, Defendants have obtained from the Ohio Environmental Protection Agency ("Ohio EPA") a permit that bypasses the NSR program altogether and fails to prevent these injuries.

19. Defendant Middletown Coke Company is a Delaware corporation that is licensed to transact business, and does transact business, in the State of Ohio. Middletown Coke Company is an owner and operator of the proposed Coke Plant. Middletown Coke Company is a subsidiary of Defendant SunCoke Energy, Inc.

20. Defendant SunCoke Energy is a Delaware corporation. SunCoke Energy is an owner and operator of the proposed Coke Plant. In addition, SunCoke Energy exercises pervasive control over Middletown Coke Company's affairs. SunCoke Energy has caused, participated in, controlled, and/or directed the violations of law described in this Complaint. SunCoke Energy knew or should have known about these violations and had the authority to prevent or stop these violations, but failed to do so. Furthermore, SunCoke Energy has disregarded the corporate form

8

for Middletown Coke Company, so that Middletown Coke Company has no mind of its own. SunCoke Energy has used its control over Middletown Coke Company to perpetrate the CAA violations described in this Complaint. Therefore, the corporate veil for Middletown Coke Company should be disregarded and liability assessed against SunCoke Energy for these CAA violations.

21. Each Defendant is a "person" within the meaning of Section 302(e) of the Act, 42 U.S.C. § 7602(e).

## IV. STATUTORY AND REGULATORY BACKGROUND

22. The Clean Air Act is designed to protect and enhance the quality of the nation's air so as to promote the public health and welfare and the productive capacity of its population. Section 101(b)(1) of the Act, 42 U.S.C. § 7401(b)(1).

### The National Ambient Air Quality Standards (NAAQS)

23. Section 108(a) of the Act, 42 U.S.C. § 7408(a), requires the Administrator of U.S. EPA to identify and prepare air quality criteria for each air pollutant, the emission of which may endanger public health or welfare, and the presence of which results from numerous or diverse mobile or stationary sources. For each such "criteria" pollutant, Section 109 of the Act, 42 U.S.C. § 7409, requires U.S. EPA to promulgate NAAQS as are necessary to protect the public health and welfare. Pursuant to Sections 108 and 109, 42 U.S.C. §§ 7408-7409, U.S. EPA has identified and promulgated NAAQS for, *inter alia*, $NO_2$, $SO_2$, CO, $PM_{10}$, $PM_{2.5}$, and ozone (that is, ground-level smog). 40 C.F.R. §§ 50.4 - 50.11, -50.13.

24. Under Section 107(d) of the Act, 42 U.S.C. § 7407(d), each state is required to designate those areas within its boundaries where the air quality is better or worse than the NAAQS for each criteria pollutant, or where the air quality cannot be classified due to

insufficient data. An area that meets the NAAQS for a particular pollutant is an "attainment" area. An area that does not meet the NAAQS is a "nonattainment" area. An area that cannot be classified due to insufficient data is "unclassifiable."

25. Butler County, the site of the Coke Plant, has been determined to be attainment or unclassifiable for the criteria pollutants $NO_2$, $SO_2$, CO, $PM_{10}$, and the national one-hour primary ambient air quality standard for ozone (40 C.F.R. § 50.9).

26. Butler County has been determined to be nonattainment for the criteria pollutant $PM_{2.5}$ and for the national eight-hour ambient air quality standard for ozone (40 C.F.R. § 50.10).

**The Prevention of Significant Deterioration (PSD) Requirements**

27. Part C of Title I of the Act, 42 U.S.C. §§ 7470-7492 ("Part C"), sets forth requirements for the prevention of significant deterioration of air quality in those areas designated as attainment areas for purposes of the NAAQS. These requirements (referred to as the "PSD program") are designed to protect public health and welfare, to assure that economic growth will occur in a manner consistent with the preservation of existing clean air resources, and to assure that any decision to permit increased air pollution is made only after careful evaluation of all the consequences of such a decision and after public participation in the decision making process.

28. Section 165(a) of the Act, 42 U.S.C. § 7475(a), prohibits the construction of any major emitting facility in any attainment area unless specified requirements and conditions are satisfied, including the following:

(A)     A permit has been issued for the proposed facility in accordance with Part C setting forth emission limitations for the proposed facility that conform to the requirements of Part C;

10

(B)     The proposed permit has been subject to a review in accordance with Section 165

of the Act, the required analysis has been conducted in accordance with

regulations promulgated by the Administrator of U.S. EPA, and a public hearing

has been held with opportunity for interested persons, including representatives of

the Administrator, to appear and submit written or oral presentations on the air

quality impact of such source, alternatives thereto, control technology

requirements, and other appropriate considerations;

(C)     The owner or operator of the proposed facility demonstrates, as required pursuant

to Section 110(J) of the Act, 42 U.S.C. § 7410(J), that emissions from

construction or operation of such facility will not cause, or contribute to, air

pollution in excess of (i) any maximum allowable increase for maximum

allowable concentration for any pollutant in any area to which Part C applies

more than once per year, (ii) any NAAQS in any air quality control region, or (iii)

any other applicable emission standard or standard of performance under the Act;

(D)     The proposed facility is subject to the best available control technology for each

pollutant subject to regulation under the Act emitted from, or which results from,

the proposed facility; and

(E)     There has been an analysis of any air quality impacts projected for the area as a

result of growth associated with the proposed facility.

29.  Sections 110(a)(2)(C) of the Act, 42 U.S.C. §§ 7410(a)(2)(C), requires states to adopt

a SIP that includes a program for the enforcement of emission limits and other control measures,

including a state PSD permit program as provided in Part C of the Act.

30.  A state may comply with Sections 110(a) and 161 of the Act by having its own PSD

11

regulations approved as part of its SIP by U.S. EPA, which must be at least as stringent as those set forth at 40 C.F.R. § 51.166.

31.  The term "major emitting facility" as used in Part C of the Act includes coke oven batteries which emit, or have the potential to emit, one hundred tons per year or more of any air pollutant, and other non-enumerated facilities which emit, or have the potential to emit, two hundred fifty (250) tons per year or more of any air pollutant.  Section 169(1) of the Act, 42 U.S.C. § 7479(1).

32.  The term "construction" as used in Part C of the Act includes the "modification", as that term is used in Section 111(a)(4) of the Act, 42 U.S.C. § 7411(a)(4), of any source or facility.  Section 169(2)(C) of the Act, 42 U.S.C. § 7479(2)(C).  The term "modification," in turn, means any physical change in, or change in the method of operation of, a stationary source which increases the amount of any air pollutant emitted by such source or which results in the emission of any air pollutant not previously emitted.  Section 111(a)(4) of the Act, 42 U.S.C. § 7411(a)(4).

33.  Regulations promulgated pursuant to the PSD provisions of the Act define a "major modification" as a modification of a major stationary source that would result in a net emission increase, and an increase in a source's potential to emit, of greater than 100 tons/year of CO, 40 tons of $NO_x$, 40 tons/year of $SO_2$, 40 tons/year of ozone precursors (volatile organic compounds ("VOCs") or $NO_x$), 25 tons/year of PM emissions, 15 tons/year of $PM_{10}$, 10 tons/year of hydrogen sulfide, or any increase in a regulated NSR pollutant not expressly listed.  40 C.F.R. § 52.21(b)(2), (23).  Collectively, these pollutant-specific emissions thresholds are referred to herein as "Significance Thresholds."

12

34. Regulations promulgated pursuant to the PSD provisions of the Act define the term "major stationary source" to include coke oven batteries which emit, or have the potential to emit, one hundred tons per year or more of any air pollutant, and other non-enumerated facilities which emit, or have the potential to emit, two hundred fifty (250) tons per year or more of any air pollutant. 40 C.F.R. § 52.21(b)(1).

35. Section 161 of the Act, 42 U.S.C. § 7471, requires states to adopt a SIP that contains emission limitations and such other measures as may be necessary to prevent significant deterioration of air quality in areas designated as attainment or unclassifiable.

### Ohio's PSD Program

36. The PSD regulations for Ohio are set forth in O.A.C. §§ 3745-31-01 through 3745-31-20. Any Ohio regulations approved as part of Ohio's SIP constitute federal law enforceable under the CAA. Pursuant to 40 C.F.R. § 52.1884, the federal PSD regulations set forth in 40 C.F.R. § 52.21 are also incorporated and made a part of Ohio's SIP.

37. O.A.C. § 3745-31-13(C) states that the requirements of O.A.C. §§ 3745-31-10 through 3745-31-20 shall apply to any major stationary source or major modification in any area in Ohio that has been designated as attainment or unclassifiable for any NAAQS. *See also* 40 C.F.R. § 52.21(a)(2).

38. The PSD regulations for Ohio provide that no actual construction of a major stationary source or major modification located in an attainment area can occur without first complying with the requirements set forth in O.A.C. §§ 3745-31-01 through 3745-31-20 and obtaining a valid permit to install. 40 C.F.R. § 52.21(a)(2)(iii); O.A.C. § 3745-31-13(a).

39. Under the PSD regulations for Ohio, the term "construction" means any physical change or change in the method of operation (including fabrication, erection, installation,

13

demolition, or modification of an emissions unit) that would result in a change in emissions.  40

C.F.R. § 52.21(b)(8); O.A.C. § 3745-31-01(DD).  To "begin actual construction" means, *inter*

*alia*, the initiation of physical on-site construction activities on an emissions unit of a permanent

nature such as the installation of building supports and foundations, laying underground

pipework, and construction of permanent storage structures.  40 C.F.R. § 52.21(b)(11); O.A.C. §

3745-31-01(R).

    40.  Under the PSD regulations for Ohio, the term "major stationary source" includes

coke oven batteries which emit, or have the potential to emit, one hundred tons per year or more

of any air pollutant, and other non-enumerated facilities which emit, or have the potential to

emit, two hundred fifty (250) tons per year or more of any air pollutant.  40 C.F.R. §

52.21(b)(1)(i); O.A.C. § 3745-31-01(LLL).

    41.  The term "major modification" is defined under the PSD regulations for Ohio as any

physical change in or change in the method of operation of a major stationary source that would

result in a significant emissions increase, and a significant net emissions increase, of any

pollutant subject to regulation under the Act.  40 C.F.R. § 52.21(b)(2)(i); O.A.C. § 3745-31-

01(JJJ).  The Significance Thresholds under the Ohio PSD program are the same as those under

the federal regulations referenced at Paragraph 33, above.  40 C.F.R. § 52.21(b)(40); O.A.C. §

3745-31-01(MMMMM)(1).

    42.  Under the PSD program for Ohio, any application for a PSD permit for a major

stationary source or major modification must include an analysis of ambient air quality in the

area of the facility for each criteria pollutant that, in the case of a major stationary source, the

source has the potential to emit in a significant amount, or, in the case of a major modification,

would result in a significant net emissions increase.  40 C.F.R. § 52.21(m); O.A.C. § 3745-31-14(B).

43.  Under the PSD regulations for Ohio, an owner or operator of a proposed major stationary source or major modification in an attainment area must demonstrate in its permit application that allowable emission increases from the proposed major stationary source or major modification, in combination with all other applicable emissions increases or reductions, would not cause or contribute to air pollution in violation of either any NAAQS, or any applicable maximum allowable increase over the baseline ambient concentrations in any attainment area. This rule applies to any air pollutant for which the stationary source or modification is major, and for which the area has been designated in attainment.  40 C.F.R. § 52.21(k); O.A.C. § 3745-31-16.

44.  Under the PSD regulations for Ohio, an owner or operator of a proposed major stationary source or major modification must provide an analysis in its permit application of the impairment to visibility, soils and vegetation that would occur as a result of the stationary source or modification and general commercial, residential, industrial and other growth associated with the stationary source or modification.  The owner or operator must also provide an analysis of the air quality impact projected for the attainment area as a result of general commercial, residential, industrial and other growth associated with the stationary source or modification. This rule applies to any air pollutant for which the stationary source or modification is major, and for which the area has been designated in attainment.  40 C.F.R. § 52.21(o); O.A.C. § 3745-31-17.

45.  Under the PSD regulations for Ohio, any person proposing a major stationary source is required to apply the best available control technology ("BACT") for each regulated pollutant

that the proposed major stationary source would have the potential to emit in significant

amounts. 40 C.F.R. § 52.21(j)(2); OAC § 3745-31-15(C). Any person proposing a major

modification is required to apply BACT for each regulated pollutant for which the proposed

major modification will result in a significant net emissions increase from the stationary source.

40 C.F.R. § 52.21(j)(3); OAC § 3745-31-15(D). For a major modification, BACT must be

applied to each proposed emissions unit at which a net emissions increase in such an air pollutant

would occur as a result of a physical change or change in the method of operation in the

emissions unit. 40 C.F.R. § 52.21(j)(3); O.A.C. § 3745-31-15(D).

46. Under the PSD regulations for Ohio, the owner or operator of a proposed major

stationary source or major modification is required to submit all information necessary to

perform an analysis or make a determination required under the Ohio SIP PSD rule. 40 C.F.R. §

52.21(n); O.A.C. § 3745-31-12(B).

**The Nonattainment New Source Review Requirements**

47. Part D of Title I of the CAA, 42 U.S.C. §§ 7501-7515 ("Part D"), sets forth

provisions for NSR requirements for areas designated by U.S. EPA as nonattainment for

purposes of meeting the NAAQS. These provisions are referred to herein as "Nonattainment

NSR." The Nonattainment NSR program is intended to restrict emissions of air pollutants in

areas that have not attained one or more NAAQS so that the areas make reasonable further

progress towards meeting the NAAQS.

48. Section 172(c)(5) of the Act, 42 U.S.C. § 7502(c)(5), requires states to adopt and

obtain U.S. EPA approval of Nonattainment NSR SIP rules that require permits for the

construction and operation of new or modified major stationary sources in nonattainment areas,

in accordance with Section 173 of the Act, 42 U.S.C. § 7503.

16

49.  Rules enacted by U.S. EPA under the Nonattainment NSR provisions of the Act define "major stationary source" as, *inter alia*, any stationary source of air pollutants which emits, or has the potential to emit, one hundred (100) tons per year or more of any air pollutant subject to regulation under the Act.  A major stationary source that is major for VOCs or $NO_x$ is also major for ozone.  40 C.F.R. Part 51, Appendix S, at (II)(A)(4).

50.  Rules enacted by U.S. EPA under the Nonattainment NSR program define "major modification" as any physical change in or change in the method of operation of a major stationary source that would result in a significant emissions increase, or significant net emissions increase, of any pollutant subject to regulation under the Act.  40 C.F.R. Part 51, Appendix S at (II)(A)(5)(i).  The Significance Thresholds under the federal Nonattainment NSR program are the same as those under the federal PSD regulations referenced at Paragraph 33, above.

51.  Section 173 of the Act, 42 U.S.C. § 7503, sets forth the following specific requirements for the issuance of permits for new or modified stationary sources in nonattainment areas:

> (A)     By the time the source is to commence operation, the source must have obtained sufficient offsetting emission reductions such that the sum of the total allowable emissions from existing sources in the region, from new or modified sources which are not major emitting facilities, and from the proposed source will be less than total emissions from existing sources prior to the application for the permit so as to represent reasonable further progress toward attainment of the NAAQS. CAA § 173(a)(1)(A), 42 U.S.C. § 7503(a)(1)(A).

17

(B)     The proposed source must comply with the Lowest Achievable Emission Rate. CAA § 173(a)(2), 42 U.S.C. § 7503(A)(2).

(C)     The owner or operator of the proposed source must demonstrate that all major stationary sources owned or operated by such person (or by any entity controlling, controlled by, or under common control with such person) in such State are subject to emission limitations and are in compliance, or on a schedule for compliance, with all applicable emission limitations and standards under the Act. CAA § 173(a)(3), 42 U.S.C. § 7503(a)(3).

(D)     The permitting authority must determine that an analysis of alternative sites, sizes, production processes, and environmental control techniques for such proposed source demonstrates that benefits of the proposed source significantly outweigh the environmental and social costs imposed as a result of its location, construction, or modification.  CAA § 173(a)(5), 42 U.S.C. § 7503(a)(5).

**Ohio's Nonattainment NSR Regulations**

52.  Ohio's Nonattainment NSR program is set forth in O.A.C. §§ 3745-31-21 through -27.  Because Ohio has not obtained U.S. EPA approval of SIP provisions meeting the requirements of the federal $PM_{2.5}$ Nonattainment NSR rule revisions of May 16, 2008, 73 Fed. Reg. 28321 (May 16, 2008), the federal Nonattainment NSR regulations set forth in 40 C.F.R. Part 51, Appendix S, also govern sources that are "major stationary sources" or "major modifications" for $PM_{2.5}$ in Ohio.  73 Fed. Reg. 28342 (May 16, 2008).

53.  Under Ohio's Nonattainment NSR regulations and 40 C.F.R. Part 51, Appendix S, no owner or operator of a major stationary source or major modification located in a nonattainment area may begin actual construction of such major stationary source or major modification

18

without first complying with O.A.C. §§ 3745-31-21 through -27 and 40 C.F.R. Part 51, Appendix S and obtaining a preconstruction Permit to Install satisfying the requirements of the Nonattainment NSR program.  40 C.F.R. Part 51, Appendix S at (IV); O.A.C. § 3745-31-21(A).

54.  The provisions of the Nonattainment NSR rules apply to any major stationary source or major modification that would be constructed in an area designated as nonattainment for a pollutant for which the stationary source or modification is major.  40 C.F.R. Part 51, Appendix S, at (II)(C); O.A.C. § 3745-31-21(C).

55.  For purposes of the Nonattainment NSR rules, the definitions of "construction," "actual construction," "major stationary source," "major modification," and "significant net emissions increase" are the same as the definitions set forth in Paragraphs 39 through 41, above.

56.  The Nonattainment NSR rules require that in order to obtain a Nonattainment NSR Permit to Install, the owner or operator of a major stationary source, or of a source undertaking a major modification, must, among other things:

(A)     comply with the Lowest Achievable Emissions Rate,  40 C.F.R. Part 51, Appendix S, at (IV)(A), Condition 1; O.A.C. § 3745-31-22(a)(1);

(B)     certify that all existing major stationary sources owned or operated by the applicant (or by any entity controlling, controlled by, or under common control with the applicant) in Ohio are in compliance with all applicable emission limitations and standards under the Act, or are in compliance with an expeditious schedule which is federally enforceable or contained in a court decree, 40 C.F.R. Part 51, Appendix S, at (IV)(A), Condition 2; O.A.C. 3745-31-22(A)(2); and

(C)     Obtain emission offsets from existing air contaminant sources in the area of the proposed major stationary source (whether or not under the same ownership) such

that there will be reasonable progress, as determined by the Director, toward

attainment of the applicable NAAQS.  40 C.F.R. Part 51, Appendix S, at (IV)(A),

Conditions 3-4; O.A.C. § 3745-31-22(A)(3)-(4).

**Emissions Netting**

57.  Under both the federal and Ohio PSD and Nonattainment NSR rules, whether a

physical or operational change at an existing stationary source constitutes a "major modification"

depends on whether the "net emissions increase" resulting from that change is equal to or greater

than the applicable Significance Thresholds.

58.  The term "net emissions increase" is defined as the amount by which the sum of the

following exceeds zero: (a) any increase in emissions from a particular physical change or

change in method of operation at a stationary source; and (b) any other increases and decreases

in actual emissions at the stationary source that are contemporaneous with the particular change

and are otherwise creditable.  40 C.F.R. § 52.21(b)(3)(i)(a)-(b); 40 C.F.R. Part 51, Appendix S at

(II)(A)(6)(i)(a)-(b); O.A.C. § 3745-31-01(TTT).  Combining increases from a proposed change

with other contemporaneous and creditable increases and decreases in actual emissions is

commonly referred to as "emissions netting."

59.  An increase or decrease in actual emissions is contemporaneous for purposes of

emissions netting only if it occurs between the date five years before construction of the

proposed change commences and the date that the emissions increase from the proposed change

occurs.  40 C.F.R. § 52.21(b)(3)(ii); 40 C.F.R. Part 51, Appendix S at (II)(A)(6)(ii); O.A.C. §

3745-31-01(TTT)(3)(a).

60.  The term "commence," for purposes of emissions netting, means the owner or

operator has all necessary preconstruction approvals or permits and either has: (a) begun, or

20

caused to begin, a continuous program of actual on-site construction of the major stationary source or major modification, to be completed within a reasonable time; or (2) entered into binding agreements or contractual obligations (which cannot be canceled or modified without substantial loss to the owner or operator) to undertake a program of actual construction at the major stationary source or major modification within a reasonable time. 40 C.F.R. § 52.21(b)(9); 40 C.F.R. Part 51, Appendix S at (II)(A)(15); O.A.C. § 3745-31-01(Z).

61. Under the Ohio nonattainment NSR regulations, an emission reduction is not "creditable" for netting if Ohio EPA or U.S. EPA has relied on it in demonstrating attainment or reasonable further progress toward attainment of applicable ambient air quality standards. O.A.C. § 3745-31-01(TTT)(e)(iv).

62. Because emissions netting necessarily involves an aggregation of proposed emission increases and actual emission increases and decreases from the same stationary source, netting does not apply to new major stationary sources. 40 C.F.R. § 52.21(b)(3)(i)(a)-(b); 40 C.F.R. Part 51, Appendix S at (II)(A)(6)(i)(a)-(b); O.A.C. § 3745-31-01(TTT);

## V. **GENERAL ALLEGATIONS**

63. According to records prepared by Middletown Coke Company and SunCoke Energy, Inc., the Coke Plant will emit, or has the potential to emit, up to 483 tons per year of $NO_x$, 1,584 tons per year of $SO_2$, 129 tons per year of CO, and 526 tons per year of various forms of PM, including 114 tons of $PM_{2.5}$.

64. Nevertheless, Middletown Coke Company and SunCoke Energy assert that the Coke Plant is not subject to either PSD or Nonattainment NSR because, according to Defendants, the Coke Plant constitutes a modification of the AK Steel Middletown Works, an existing major stationary source, and the net emissions increases from the Coke Plant will not exceed the

21

applicable Significance Thresholds. Middletown Coke Company and SunCoke Energy reached this conclusion by "netting" the emissions increases from the Coke Plant with alleged emissions decreases at the Sinter Plant at the AK Steel Middletown Works that occurred on June 16, 2003, and alleged emissions decreases from a proposed Boiler House Flame Safety Management Project at the AK Steel Middletown Works. Consequently, Defendants did not apply for a permit for preconstruction review of the project under the PSD or Nonattainment NSR regulations.

65. Defendants' emissions netting arguments referenced in Paragraph 64, above, are unlawful and insufficient to avoid the application of PSD and Nonattainment NSR to the Coke Plant for the following reasons:

(A) The Coke Plant is a separate stationary source from the AK Steel Middletown Works. Consequently, the Coke Plant is not a modification of the AK Steel Middletown Works, but is a new major stationary source. Emissions netting does not apply to new major stationary sources. 40 C.F.R. § 52.21(b)(3)(i)(a)-(b); 40 C.F.R. Part 51, Appendix S at (II)(A)(6)(i)(a)-(b); O.A.C. § 3745-31-01(TTT). As a result, the Defendants have commenced the actual construction of a new major stationary source without a permit issued under the PSD and Nonattainment NSR regulations.

(B) In the alternative, if the Coke Plant is an addition to the AK Steel Middletown Works, emissions reductions at AK Steel's Sinter Plant cannot be included for purposes of calculating the "net emissions increase" from construction of the Coke Plant because, *inter alia*, (a) the Sinter Plant emissions reductions occurred more than 5 years before construction of the Coke Plant commenced, and

therefore those emissions reductions are therefore not "contemporaneous" for

purposes of 40 C.F.R. § 52.21(b)(3)(ii), 40 C.F.R. Part 51,Appendix S, and

O.A.C. § 3745-31-01(TTT)(3)(a), and (b) since the Director of Ohio EPA

previously relied on the Sinter Plant emission decreases in demonstrating

reasonable further progress toward attainment of the $PM_{2.5}$ NAAQS, the Sinter

Plant emissions decreases are not "creditable" for purposes of 40 C.F.R. Part 51,

Appendix S, and O.A.C. § 3745-31-01(TTT)(e)(iv).

66. But for the unlawful and inclusion of the Sinter Plant emission reductions in the

netting calculations, net emissions increases from the Coke Plant would exceed Significance

Thresholds for $NO_x$, $SO_2$, CO, $PM_{10}$, and $PM_{2.5.}$

67. The Coke Plant is a "major emitting facility" for purposes of Part C of the Act, and a

"major stationary source" as that term is used in Part D of the Act and defined in 40 C.F.R.

52.21(b), 40 C.F.R. Part 51, Appendix S, and O.A.C. § 3745-31-01(LLL).

68. In the alternative, the Coke Plant is a "modified major emitting facility" for purposes

of Part C of the Act, a "modified major stationary source" for purposes of Part D of the Act, and

a "major modification" of a major stationary source as that term is defined in 40 C.F.R. Part 51,

Appendix S, 40 C.F.R. § 52.21(b)(2)(i), and O.A.C. § 3745-31-01(JJJ).

69. Because Defendants have bypassed New Source Review, the Coke Plant will be

constructed, or is being constructed, without complying with the requirements of the PSD

program applicable to major emitting facilities, major stationary sources, and/or major

modifications, including the following requirements designed to reduce air pollutants:

(A)     The Coke Plant will not install the Best Available Control Technology for

emissions of CO, $SO_2$, $NO_x$, and $PM_{10,}$ as required by Section 165(a)(1) and (4) of

23

the Act, 42 U.S.C. § 7475(a)(1), (4), 40 C.F.R. §§ 52.21(a)(2)(iii) and (j)(2), and O.A.C. §§ 3745-31-13(a) and -15;

(B)     Defendants have failed to demonstrate that emissions from construction or operation of the Coke Plant will not cause, or contribute to, air pollution in excess of any maximum allowable increase or maximum allowable concentration for any pollutant in any area to which Part C applies more than one time per year, any national and air quality standard in any air quality control region, or any other applicable emission standard or standard of performance under the Act, as required by Section 165(a)(3) of the Act, 42 U.S.C. § 7475(a)(3);

(C)     Defendants have failed to demonstrate that allowable emission increases from the Coke Plant, in combination with all other applicable emissions increases or reductions, would not cause or contribute to air pollution in violation of either any NAAQS, or any applicable maximum allowable increase over the baseline ambient concentrations in any attainment area, as required by 40 C.F.R. § 52.21(k) and O.A.C. §§ 3745-31-16;

(D)     Defendants have provided no analysis of the impairment to visibility, soils and vegetation that would occur as a result of the Coke Plant and general commercial, residential, industrial and other growth associated with the Coke Plant, as required by Section 165(a)(6) of the Act.  42 U.S.C. § 7475(a)(6), 40 C.F.R. § 52.21(o), and O.A.C. § 3745-31-17.

(E)     Defendants have provided no analysis of ambient air quality for CO, $SO_2$, $NO_x$, and $PM_{10}$ meeting the requirements of 40 C.F.R. § 52.21(m) and O.A.C. § 3745-31-14;

24

(F)     Defendants have failed to provide all information necessary to perform the analyses or to make the determinations required under 40 C.F.R. § 52.21 and O.A.C. § 3745-31-12, as required by 40 C.F.R. § 52.21(n) and O.A.C. § 3745-31-12.

70.  Because Defendants have bypassed New Source Review, the Coke Plant will be constructed, or is being constructed, without complying with the requirements of the Nonattainment NSR program applicable to major stationary sources and/or major modifications, including the following requirements designed to reduce air pollutants:

(A)     The Coke Plant is being constructed without installing air pollution control equipment achieving the Lowest Available Emissions Rate for emissions of $PM_{2.5}$, $SO_2$, and $NO_x$, as required by Section 172(c)(5) and 173(a) of the Act, 42 U.S.C. §§ 7502(c)(5), 7503(a), 40 C.F.R. Part 51, Appendix S, and O.A.C. §§ 3745-31-31-21(a);

(B)     Defendants have not obtained sufficient offsetting emission reductions for $PM_{2.5}$, $SO_2$, and $NO_x$ such that total allowable emissions from existing sources in the region, from new or modified sources which are not major emitting facilities, and from the Coke Plant will be sufficiently less than total emissions from existing sources prior to the application for the permit so as to represent reasonable further progress toward attainment of the $PM_{2.5}$ and eight-hour ozone NAAQS, as required by Section § 173(a)(1)(A) of the Act, 42 U.S.C. § 7503(a)(1)(A), 40 C.F.R. Part 51, Appendix S, and O.A.C. §§ 3745-31-25 through -27;

(C)     Defendants have not certified that all existing major stationary sources owned or operated by the Defendants (or by any entity controlling, controlled by, or under

common control with the Defendants) in Ohio are in compliance with all applicable emission limitations and standards under the Clean Air Act, or are in compliance with an expeditious schedule which is federally enforceable or contained in a court decree, as required by 40 C.F.R. Part 51, Appendix S, Condition 3, and O.A.C. 3745-31-22(A)(2); and

(D)      Defendants have not demonstrated, through an analysis of alternative sites, sizes, production processes, and environmental control techniques for the Coke Plant, that the benefits of the Coke Plant significantly outweigh the environmental and social costs imposed as a result of its location and construction, as required by Section 173(a)(5) of the Act, 42 U.S.C. § 7503(a)(5).

**FIRST CLAIM FOR RELIEF**
**(Construction of Major Stationary Source in**
**Violation of PSD and Nonattainment NSR)**

71.  Paragraphs 1 through 70(D) are realleged and incorporated herein by reference.

72.  On or about January 26, 2008, Defendants Middletown Coke Company and SunCoke Energy proposed to construct, or began actual construction of, the Coke Plant, which will be a new major stationary source and new major emitting facility, without obtaining a permit meeting the requirements of Parts C and D of Title I of the Act.

73.  The acts and omissions of Defendants Middletown Coke Company and SunCoke Energy described in this Count constitute actual or threatened violations of Section 165(a) of the Act, 42 U.S.C. § 7475(a), and the PSD regulations set forth in 40 C.F.R. § 52.21 and/or O.A.C. Chapter 3745-31.  Unless restrained by an order of this Court, these violations will continue.

74.  The acts and omissions of Defendants Middletown Coke Company and SunCoke Energy described in this Count constitute actual or threatened violations of the Nonattainment

26

NSR provisions of Part D of Title I of the Act, 42 U.S.C. §§ 7501-7515, and the Nonattainment

NSR regulations set forth in 40 C.F.R. Part 51, Appendix S and OAC Chapter 3745-31. Unless

restrained by an order of this Court, these violations will continue.

### SECOND CLAIM FOR RELIEF
### (Construction of Major Modification in
### Violation of PSD and Nonattainment NSR)

75. Monroe asserts this claim in the alternative to the First Claim for Relief. Paragraphs

1 through 70(D) are realleged and incorporated herein by reference.

76. On or about January 26, 2008, Defendants Middletown Coke Company and SunCoke

Energy proposed to construct, or began actual construction of, the Coke Plant, which will be a

major modification of a major stationary source, without obtaining a permit meeting the

requirements of Parts C and D of Title I of the Act.

77. The acts and omissions of Defendants Middletown Coke Company and SunCoke

Energy described in this Count constitute actual or threatened violations of Section 165(a) of the

Act, 42 U.S.C. § 7475(a), and the PSD regulations set forth in 40 C.F.R. § 52.21 and/or O.A.C.

Chapter 3745-31. Unless restrained by an order of this Court, these violations will continue.

78. The acts and omissions of Defendants Middletown Coke Company and SunCoke

Energy described in this Count constitute actual or threatened violations of the Nonattainment

NSR provisions of Part D of Title I of the Act, 42 U.S.C. §§ 7501-7515, and the Nonattainment

NSR regulations set forth in 40 C.F.R. Part 51, Appendix S and O.A.C. Chapter 3745-31. Unless

restrained by an order of this Court, these violations will continue.

## PRAYER FOR RELIEF

WHEREFORE, based upon all the foregoing allegations, the City of Monroe, Ohio, requests that this Court:

1.      Issue a declaratory judgment declaring (a) that the Coke Plant is a major stationary source (or, in the alternative, a major modification) subject to Parts C and D of Subchapter I of the Act, and (b) that Defendants Middletown Coke Company and SunCoke Energy have violated the Clean Air Act by commencing construction of the Coke Plant without a major source permit as required under parts C and D of subchapter I of the Act;

2.      Preliminarily and permanently enjoin each Defendant from constructing or operating the Coke Plant without first obtaining a major source permit issued pursuant to and in conformance with Parts C and D of Title I of the Act and all applicable regulatory requirements promulgated or approved thereunder;

3.      Assess a civil penalty against each Defendant of up to $32,500 per day for each violation of the Act and applicable regulations;

4.      Award Plaintiff its reasonable costs, disbursements, expert witness fees, and attorneys' fees;

5.      Retain jurisdiction of this suit for the purpose of making any order or decree which it may deem necessary at any time to carry out its judgment; and

6.      Grant such other relief as the Court deems just and proper.


Dated: January 28, 2009.

Respectfully submitted,

*s/Jack A. Van Kley*
Jack A. Van Kley (0016961)
Van Kley & Walker, LLC
132 Northwoods Blvd., Suite C-1
Columbus, OH 43235
Telephone: (614) 431-8900
Facsimile:  (614) 431-8905
E-Mail: jvankley@vankleywalker.com

Trial Attorney for Plaintiff City of Monroe

Christopher A. Walker (0040696)
Van Kley & Walker, LLC
137 North Main Street, Suite 316
Dayton, OH 45402-1772
Telephone: (937) 226-9000
Facsimile: (937) 226-9002
E-Mail: cwalker@vankleywalker.com

Of Counsel